## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ALMA BOJORQUEZ, JAKE VALLANTE, MATTHEW ALLAN and BRIELLE BRATTON, individually, and on behalf of all others similarly situated, | : : : : : | Case No. 2:16-cv-00551-MHW-EPD<br><br>JOINT MOTION FOR FINAL APPROVAL OF CLASS AND |
| Plaintiffs, | : : | COLLECTIVE ACTION SETTLEMENT |
| vs. | : : | JUDGE MICHAEL H. WATSON |
| ABERCROMBIE & FITCH CO.; ABERCROMBIE & FITCH STORES, INC.; and DOES 1 through 10, inclusive, | : : : | MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS |
| Defendants. | : : | *Extended Page Length Permitted Orally by the Court on 8/06/2018 |

And Related Case

| | | |
|---|---|---|
| ALEXANDER BROWN and ARIK SILVA, individually, and on behalf of all others similarly situated, | : : : | Case No. 2:17-cv-01093-MHW-EPD |
| Plaintiffs, | : : : | JOINT MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT |
| vs. | : : | JUDGE MICHAEL H. WATSON |
| ABERCROMBIE & FITCH CO.; ABERCROMBIE & FITCH STORES, INC.; and DOES 1 through 10, inclusive, | : : : | MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS |
| Defendants. | : : : | *Extended Page Length Permitted Orally by the Court on 8/06/2018 |

## JOINT MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT

Representative Plaintiffs Jake Vallante, Matthew Allan, and Brielle Bratton in the matter of *Bojorquez, et. al. v. Abercrombie & Fitch Co., et al.*, case number 2:16-cv-00551-MHW-EPD ("*Bojorquez* action"), and Plaintiffs Alexander Brown and Arik Silva in the matter of *Brown, et. al. v. Abercrombie & Fitch Co., et al.*, case number 2:17-cv-01093-MHW-EPD ("*Brown* action"),

jointly with Defendants Abercrombie & Fitch Co. and Abercrombie & Fitch Stores, Inc. ("Defendants" or "Abercrombie"), hereby move for final approval of the parties' settlement of the claims asserted in these actions (a copy of the Settlement Agreement was attached as Exhibit 1 to the Declaration of Randall B. Aiman-Smith in Support of Motion for Preliminary Approval ("Aiman-Smith Decl."), found at Dkt. No. 168[1]).

These cases allege that Abercrombie forced its employees to purchase clothing as a condition of their employment, and then refused to reimburse the attendant expense, causing the employees' wages to fall below the applicable minimum wage, in violation of the Fair Labor Standards Act and the laws of California, New York, Florida, and Massachusetts. The cases have been litigated for years and, after extensive written discovery, thirty-nine depositions, motion practice, including class certification in the *Brown* case, and mediation efforts, have been resolved on terms the parties strongly believe represent the fair, reasonable, and adequate resolution of this bona fide legal dispute.

Accordingly, the parties respectfully request that this Court grant the parties' motion for final approval of class action settlement and issue an Order:

(1) approving the parties' Settlement Agreement as being fair, reasonable, and adequate;

(2) certifying the New York, Florida, and Massachusetts, subclasses in the *Bojorquez* matter under Rule 23 of the Federal Rules of Civil Procedure for settlement purposes only;

(3) approving an FLSA collective action comprised of persons who timely joined the FLSA action for settlement purposes only by submitting a joinder form or visiting the settlement website and submitting a claim;

(4) finding Class Counsel and the Class Representatives have adequately represented the Settlement Class;

---

[1] Note that the Docket Numbers referenced herein correspond to the Docket in the *Brown* action.

(6)      approving the settlement payments for distribution to the Plaintiffs, Settlement Class and Collective members, Settlement Claims Administrator, and the Labor Workforce and Development Agency; and

(7)      entering the Final Order of Approval and Judgment Regarding Class and Collective Action Settlement, with no finding of liability, with the class members providing the release set forth in the settlement.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Class Counsel, the Declarations of Representative Plaintiffs, the Declaration of Kelly Kratz, the attached and referenced exhibits, and all other records, pleadings and papers on file in this action.

A proposed Final Order of Approval and Judgment Regarding Class and Collective Action Settlement is submitted for the Court's consideration.

Respectfully submitted:

Dated: August 13, 2018

/s/  Hallie Von Rock
Hallie Von Rock (admitted Pro Hac Vice)
Randall Aiman-Smith (admitted Pro Hac Vice)
Aiman-Smith & Marcy, PC
7677 Oakport Street, Suite 1150
Oakland, California 94621
Telephone: 510-817-2711
Facsimile: 510-562-6830
Email: hvr@asmlawyers.com

*Attorneys for Plaintiffs and the Class*

Dated: August 13, 2018

/s/   Mark D. Kemple
Mark Kemple (admitted Pro Hac Vice)
John R. Richards
Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: 310-586-7700
Facsimile: 310-586-7800
Email: kemplem@gtlaw.com
Attorney for Defendants Abercrombie & Fitch Co. and Abercrombie & Fitch Stores, Inc.

*Attorneys for Defendants*

## I.    INTRODUCTION

Named Plaintiffs, jointly with Defendants Abercrombie & Fitch Co. and Abercrombie & Fitch Stores, Inc. ("Defendants" or "Abercrombie"), seek final approval of the settlement of Plaintiffs' claims against Defendants for alleged violations of the Fair Labor Standards Act ("FLSA") and the laws of certain states for reimbursement of business expenses and minimum wages.   On February 16, 2018, this Court preliminarily approved the parties' Settlement Agreement, which created a twenty-five million dollar ($25,000,000) settlement fund for the benefit of Settlement Class and Collective members.  (Dkt. No. 171.)  The Court found on a preliminary basis that the terms of the settlement are "fair, reasonable, and adequate," and approved the Notice and claims procedure set forth in the Settlement Agreement.  The Notice disclosed all essential terms of the settlement, including the claims process and deadline, the opt-out and objection process and deadline, the amount of attorney's fees to be requested, litigation costs, claims administration costs, Named Representative incentive awards sought, and Private Attorney General Act ("PAGA") payments.  The Settlement Class is comprised of approximately 214,000 persons in four states (California, New York, Florida, and Massachusetts) who once worked in one or more of Defendants' stores, each of whom received deep discount (up to 50%) on any clothing items they purchased, and who did not opt-out of the settlement.[2]  It is also comprised of 1,131 similarly situated persons in the remaining 46 states, who also affirmatively joined in the FLSA claims in this action by timely submitting a joinder form or making a claim using the settlement website.

Though Abercrombie repeatedly informed its employees that no purchase was necessary, including by a written certification that the employee gave with each and every purchase he/she made that the employee understood that the employer in no way required such a purchase,[3] Plaintiffs allege that Abercrombie had an unwritten "practice" of coercing its employees to

---

[2] As discussed herein, only a tiny fraction of such persons (386) opted-out of this Settlement, and none have objected.

[3] *See, e.g.*, Dkt. No. 169, Declaration of Mark D. Kemple in Support of Motion for Preliminary Approval, ("Kemple Decl."), at Ex. 4, Def. 9/13/17 Med. Brief at pp. 2-5, and Exs. A-H thereto.)

purchase clothing as a condition of their employment.

The Settlement, therefore, provided notice to each class and collective member (with follow up notice) advising that he/she could recover from the $16.7 million Net Distribution Fund for any purchases he/she identified as somehow "coerced."  It further advised that he/she could do so simply by going to a website and selecting any of his/her purchases (an individualized list of past purchases was provided to each person) *that he/she believed was in some way coerced*.  The parties also agreed that if a Settlement Class member merely returned a post-card (that was sent with the Notice) indicating a desire to participate in the settlement, but did not select items on-line (as otherwise required by the agreement), that person still would receive approximately 84% of his/her maximum recovery under the Settlement – as if he/she had gone on line and selected 84% of his/her purchases.

Though, consistent with Defendants' contentions throughout this lawsuit, the number of persons who identified any purchases as having been coerced is somewhat modest, the reaction of the class to the Settlement has been overwhelmingly positive.  Indeed, less than one tenth of one percent of potential class members opted out, and no objection to the settlement has been filed by any person.  Further, 31,649 Settlement Class and Collective members submitted claims (in written form, on-line, or both).  Every person who submitted a timely claim will receive payment from the Net Distribution Fund.

Accordingly, every Settlement Class and Collective member who believed they were coerced or compelled to purchase clothing from Defendants during their employment had an opportunity to receive compensation from the settlement.  Further, in the course of these litigations Defendants relaxed the dress code to provide a more broad selection of items from Abercrombie and from its many competitors.  To be clear, however, it is undisputed that throughout the class period: (1) Abercrombie permitted its employees to wear non-Abercrombie/Defendant clothing to work; (2) its employees wore competitor's clothing to work; and (3) more than one third of its employees made no purchase at all from Abercrombie.[4]  In short, Abercrombie has maintained

---

[4] Dkt. No. 169, Kemple Decl., Ex. 4, Def. 9/13/17 Med. Brief at p. 2-5, 13-26; *id.* Ex. 3,

throughout that there was no "policy" or "practice" requiring or coercing employees to purchase its clothing.  Plaintiffs, on the other hand, assert that they have presented strong evidence that pressure was applied by management on Abercrombie employees to purchase clothing items for Defendants' benefit.  In the face of these competing arguments that would certainly require protracted litigation to resolve, the substantial benefit provided to eligible Settlement Class and Collective members, and the lack of objections, this constitutes compelling evidence that the settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class and Collective members.  *See, Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 619 (6th Cir. 2007) (hereinafter "*UAW*") (discussing approval of a class action settlement under Federal Rule of Civil Procedure 23); *see also, Vigna v. Emery Fed. Credit Union*, No. 1:15-cv-51, 2016 WL 7034237, *3 (S.D. Ohio Dec. 2, 2016) (applying same factors to approve FLSA settlement).  Accordingly, Plaintiffs and Defendants respectfully request that the Court grant final approval of the settlement.

## II.     SUMMARY OF FACTUAL AND PROCEDURAL BACKGROUND.

### A.     Class and Collective Action Allegations and Defenses.

Representative Plaintiffs Jake Vallante, Matthew Allan, and Brielle Bratton in the matter of *Bojorquez, et al. v. Abercrombie & Fitch Co., et al.*, case number 2:16-cv-00551-MHW-EPD ("*Bojorquez* action"), and Plaintiffs Alexander Brown and Arik Silva in the matter of *Brown, et al. v. Abercrombie & Fitch Co., et al.*, case number 2:17-cv-01093-MHW-EPD ("*Brown* action"), allege that Abercrombie forced its employees to purchase clothing as a condition of their employment, and then failed to reimburse the attendant expenses, thereby causing the employees' wages to fall below the applicable state and/or federal minimum wage.

The *Brown* action, filed in California in 2013 and certified as a Rule 23 class action in July 2015, alleged that these practices violate various California wage and hour laws, including those requiring employers to indemnify employees for business expenses, pay minimum wages, and provide accurate wage statements.  According to Plaintiffs, these violations give rise to claims for

---

Def. 5/17/17 Med. Brief at pp. 15-16.

restitution, damages, liquidated damages, and statutory and civil penalties. Plaintiffs in the broader *Bojorquez* action, filed in California in 2015 and transferred to this Court in December 2015, assert similar claims, alleging that the same policies deprived them of reimbursement and compensation in violation of the FLSA and in violation of the wage and hour laws of New York, Florida, and Massachusetts. Plaintiffs' allegations are grounded on, among other things, alleged statements by Abercrombie upper management that its employees are its primary marketing tool, formal and informal company systems "pushing" employee purchases, including emails from senior management and statements on training calls applying pressure on employees to purchase Abercrombie products. The central issue in these actions is Plaintiffs' contention that employees were "coerced" or "compelled" to purchase clothing items by Defendants during their employment.

Defendants vigorously deny Plaintiffs' allegations. Defendants contend that Abercrombie's policies, which putative class members repeatedly received and acknowledged in numerous signed writings, including *every time they purchased Abercrombie clothing*, expressly state that employees are not required to purchase company clothing. (*See, e.g.*, Dkt. No. 169, Kemple Decl., at Ex. 3, Def. 5/17/17 Med. Brief at pp. 11-17 and Exs. 1-8; *id.* Ex. 4, Def. 9/13/17 Med. Brief at pp. 2-5, and Exs. A-H thereto.) Further, Defendants assert that the testimony by putative class members, including some of those who provided declarations to support Plaintiffs' bid for class certification, makes clear that a very high percentage of class members did not feel they were required to purchase Abercrombie clothing, and that any such inquiry is itself highly individualized and not subject to common proof. (*See, id.*, Ex. 4, Def. 9/13/17 Med. Brief at pp. 4-5, 13-26 and exhibits I-BB.) Defendants further argue that the fact that thousands of putative class members (indeed, more than a third) subject to these alleged "coercive" practice never made a purchase at all during their years of employment with Abercrombie, demonstrates that no common proof exists to show—on a class-wide basis—that purchases of clothing were coerced (rather than made for personal reasons). Indeed, Defendants note that Plaintiff's declarants concede that they wore competitor's clothing to work at Abercrombie's stores without incident,

and purchased Defendants' clothing for personal use (or gifts) simply because they liked the items offered to them at substantial discounts. (*See* Dkt. No. 169, Kemple Decl., at Ex. 4, Def. 9/13/17 Med. Brief at pp. 14-26 (and declarations and transcripts cited therein).) Defendants further contend that even if a court could be convinced to attempt a class-wide trial of such issues, the damages and penalties available are a fraction of what Plaintiffs' claimed. (*See,* Dkt. No. 169, Kemple Decl., at Ex. 4, Def. 9/13/17 Med. Brief at pp. 30-34.)

> ### B.    Procedural History, Mediations, and Resolution.

Plaintiffs filed the *Brown* action on September 16, 2013, in Alameda County (California) Superior Court. On November 8, 2013, Abercrombie removed the action to the United States District Court for the Northern District of California (Case no. 4:13-cv-05205-YGR) and, on February 14, 2014, the case was transferred to the United States District Court for the Central District of California, *see, Brown v. Abercrombie & Fitch Co.*, N.D. Cal. No. 4:13-CV-05205 YGR, 2014 U.S. Dist. LEXIS 19414 (Feb. 14, 2014), where it was assigned the new case number 2:14-cv-01242-JGB-VBK.

Following extensive discovery, Plaintiffs moved for class certification, which Abercrombie opposed. On July 16, 2015, the Court in the *Brown* action certified four classes pursuant to Rule 23. *See, Brown v. Abercrombie & Fitch Co.*, C.D. Cal. No. CV 14-1242 JGB (VBKx), 2015 U.S. Dist. LEXIS 176214 (July 16, 2015).

Plaintiffs thereafter filed the similar, but broader, *Bojorquez* action on December 15, 2015, in the United States District Court for the Central District of California (Case No. 2:15-cv-09651-FMO-AGR), alleging violations of the FLSA on behalf of a nation-wide class, as well as violations of the labor laws of three states – California, Massachusetts, and Florida – each on behalf of a state-wide class. Plaintiffs filed a First Amended Complaint on February 26, 2016.

On June 16, 2016, the California Federal Court found the *Bojorquez* action related to the *Brown* action and ordered it transferred to this Court, noting that the actions "clearly share[] a common nucleus of operative facts" and involve "the same transaction or series" of transactions. *Bojorquez v. Abercrombie & Fitch, Co.*, 193 F.Supp.3d 1117 (C.D. Cal. 2016).

5

On July 28, 2016, Plaintiffs filed a Second Amended Complaint in the *Bojorquez* action expanding the lawsuit to add a putative class of New York employees for violations of New York state law, based on the same allegations regarding unreimbursed and compelled purchases. [*Bojorquez v. Abercrombie & Fitch Co.*, Case No. 2:16-cv-551-MWH-TPK Dkt. No. 48-2.] In Spring 2017, the actions were stayed to pursue mediation with Hunter Hughes III [*id.*, Dkt. No. 59; *Brown,* Case No. 2:14-cv-01242-JGB-E, Dkt. No. 136], and on May 23, 2017, the parties had a productive, full-day mediation session, but the case did not settle. (Declaration of Randall B. Aiman-Smith in Support of Motion for Preliminary Approval, ("Aiman-Smith Decl.") ¶2, found at Dkt. No. 168.) The parties requested the stay to remain in place in *Bojorquez*, and on June 6, 2017, the Court lifted the stay in *Brown* and the parties commenced merits discovery. [*Brown,* Case No. 2:14-cv-01242-JGB-E, Dkt. No. 139.] Abercrombie propounded written discovery and took the deposition of ten additional class members, bringing the total number of deponents in that action to thirty-nine. (Dkt. No. 168, Aiman-Smith Decl, ¶4.) In addition, the parties collected and exchanged the declarations of 147 class and putative class members. (*Id*.)

On September 18, 2017, the parties engaged in another full-day mediation with Mr. Hughes and signed a Memorandum of Understanding. (*Id.* ¶ 5.) That was followed by three months of negotiations between the parties, calls with the mediator, and a third in-person negotiation session, this time in Los Angeles. (*Id.* ¶¶ 6, 7.) After these extensive negotiations, the parties finally reached agreement, and on December 12, 2017, executed a final Settlement Agreement (*id.*, ¶¶ 8, 9; Ex. 1), which takes into consideration the disputed potential liability, the wide range of potential recovery, and the uncertainties and expense of protracted litigation. The parties believe, and the mediator agreed, that it is in the best interests of all parties and the putative settlement class and collective members, to resolve the actions on these terms.

On December 12, 2017, the parties in *Brown* stipulated that the action be transferred to this Court pursuant to 28 U.S.C. § 1404(a), and the Central District of California court did so the next day. *See,* Case No. 2:14-cv-01242-JGB(Ex) (Dkt. Nos. 152-153.)

On December 14, 2017, the transfer of the *Brown* case was complete and case number

2:17-cv-01093-MHW-EPD was assigned. [*Brown v. Abercrombie & Fitch Co.*, Case No. 2:17-cv-01093-MWH-EPD, Dkt. No. 154.] On December 19, 2017, the *Brown* and *Bojorquez* cases were related and assigned to Magistrate Judge Elizabeth Preston Deavers for further proceedings. [*Id.*, Dkt. No. 157.] On December 20, 2017, the *Brown* and *Bojorquez* cases were stayed pending approval of the final Settlement Agreement. [*Id.*, Dkt. No. 158; *Bojorquez v. Abercrombie & Fitch Co.*, Case No. 2:16-cv-551-MWH-EPD, Dkt. No. 72.]

On January 26, 2018, the parties filed a Joint Motion for Preliminary Approval of Class and Collective Action Settlement. (Dkt. No. 167.) The Declarations of Randall Aiman-Smith (Dkt. No. 168) and Mark D. Kemple (Dkt. No. 169.) were filed in support of the Motion and are referred to herein to support the facts giving rise to the settlement.

On February 16, 2018, the Court filed the Order Granting Preliminary Approval of Class and Collective Action Settlement. (Dkt. No. 171.)

On March 9, 2018, the Court set the Final Fairness Hearing for July 25, 2018. (Dkt. No. 172.) On June 1, 2018, the Court continued the Final Fairness Hearing to September 12, 2018. (Dkt. No. 177.)

## III.   SUMMARY OF SETTLEMENT TERMS AND CLAIMS ADMINISTRATION.

The Court granted preliminary approval of the settlement on February 16, 2018. (Dkt. No. 171). The Preliminary Approval Order certified for settlement purposes the following Settlement Class and Collective members:

(1) All persons employed by Abercrombie as non-exempt, hourly, non-management employees at an Abercrombie & Fitch, Abercrombie Kids, Hollister, and/or Gilly Hicks store in New York, Florida, Massachusetts, or California during all or part of the applicable "Class Period" for the state in which the individual was employed as set forth below:

in New York, for any time period between December 15, 2009, and [*date of preliminary approval*];

in Florida, for any time period between December 15, 2010, and [*date of preliminary approval*]];

in Massachusetts, for any time period between December 15, 2012, and [*date of preliminary approval*];

in California, between September 16, 2009, and [*date of preliminary*

*approval*].

(2)    All persons employed by Abercrombie in the United States as non-exempt, hourly, non-management employees at any Abercrombie & Fitch, Abercrombie Kids, Hollister, and/or Gilly Hicks store at any time between March 24, 2014, and [*date of preliminary approval*] (the "FLSA Collective Action Period"), excluding those individuals who worked for Abercrombie exclusively at a store within the State of California during that time period.

In consideration for the release of the Settlement Class and Collective members' claims, Defendants have agreed to provide monetary relief as set forth in detail in the Settlement Agreement (Dkt. No. 168, Aiman-Smith Decl., Ex. 1).  The Agreement provides for a fund of twenty-five million dollars ($25,000,000) allocated as follows: (a) $16,677,500 for payment of timely claims made by class/collective members under the terms of the Settlement, including employer payroll taxes on such payments in exchange for a Release given by Settlement Members (25% of payment made to Class and Collective Members shall be deemed wages, 75% will be deemed reimbursement, interest, and penalties); (b) $7,500,000 for payment of class counsel's attorney fees; (c) $250,000 for class counsel's costs; (d) $35,000 total for class representative enhancement payments; (e) $500,000 for claims administration costs; and (f) $37,500 to the State of California for its 75% share of the $50,000 of the settlement fund allocated for settlement of the Private Attorney General Act ("PAGA") claims (Cal. Labor Code §2699(i)). Sums not awarded by the Court will be retained by Defendant.

### A.    Administration of Class and Collective Action Notice of Settlement.

Per the Settlement Agreement, Notice was provided through direct mail notice via First-Class U.S. Mail, using the most current, known mailing addresses as identified in the Class List. (*See,* Declaration of Kelly Kratz ("Kratz Decl.") filed in support of Motion for Final Approval of Settlement) at ¶ 6; *see also*, Dkt. No. 168, Aiman-Smith Decl., Ex. 1 at Exs. A – E.)  Any Notice Packets returned to the Claims Administrator as non-deliverable on or before 60 days after mailing were sent promptly via regular First-Class U.S. Mail to any forwarding address located through skip tracing.  A total of 364,474 Notices were mailed by the Claims Administrator.  A significant number of these mailings (149,709) were to persons in the 46 states who were not subject to class

claims, and who would need to affirmatively join the national FLSA claim in order to participate in this action (and give a release), of which only a small fraction did (1,131 persons). The balance, of these mailings (214,382) went to persons within one or more of the four state class or putative class actions. (Kratz Decl. ¶ 7.)

Notice was sent to Settlement Class and Collective members in all states, except Florida, Massachusetts, and New York on March 26, 2018. The claims deadline was, therefore, May 25, 2018 (60 days after Notice was mailed). Notice was sent to Settlement Class and Collective members in Florida, Massachusetts, and New York on April 2, 2018. The claims deadline for these members was, therefore, June 1, 2018 (60 days after Notice was mailed).

The Notice advises the Settlement Class and Collective members of the material terms of the settlement (including the full Release language), the procedure, deadlines, and instructions for how to participate in, opt out, or object to the settlement. The Notice specifically advised the total amount of attorney's fees, litigation costs, named representative incentive awards, PAGA award, and settlement administration costs sought.

Accordingly, the Notice procedure preliminarily approved was followed and supports the Court finally approving the settlement.

### B. Administration of Claims Process.

Settlement Class and Collective members received a Participation Form post-card, with pre-paid postage, which they were instructed to sign and return. The Participation Forms were also made available on the settlement administration website to download. Participating members were further instructed to log-in to the settlement website to select from a list of items they purchased while employed by Abercrombie, which they contend they were compelled to purchase. Given the number of claimants, and that purchase logs are lengthy (in some cases, over 30 pages), individually printing and mailing each log was impractical and would have overwhelmed the claim process. Instead, each claimant was provided a link on the website to his/her individual purchase log and the items they selected formed the basis of their claim amount. Administering the claims in this manner allowed participating members to receive compensation for those clothing items

they certified were compelled or coerced purchases, while at the same time, protected Defendants from compensating purchases that were made voluntarily or for non-work purposes.

The two-step process for completing a claim (mailing the Participation Form and going to the settlement website to select the claimed clothing items) was not followed by some Settlement Class and Collective members. Nevertheless, *all* persons who either logged onto the settlement website to select purchases or who returned the Participation Form by the claims deadline were considered to have valid claims and received payment. For those persons who completed the online individual purchase logs, the claims administrator was able to calculate an average percentage of claims which were selected out of the total eligible. For those participating members who filed on-line claims, they claimed an average of 83.7% of their eligible total (*i.e.*, an individual who had a total of $287.35 in purchases on their log, on average selected $240.51 in clothing items to certify as being compelled or coerced purchases). For those persons who only mailed in the Participation Form, this same average rate was imputed to them in order to calculate the precise amount of their claim from their individual eligible purchase total.

Accordingly, Defendants are paying the claims of all participating Settlement Class and Collective members who in any way indicated their desire to participate in the settlement by either submitting an online claim or mailing the Participation Form by the claims deadline. As a result, this settlement has fully achieved the intent of compensating all Class and Collective Members who felt coerced or compelled to purchase Defendants' clothing while employed.

C.     **Settlement Payment Procedure.**

Individual settlement payments will be made out of the net settlement proceeds of $16,677,500, pursuant to the calculations in the Agreement, and will be funded (along with the amounts for payroll taxes, class counsel's attorney fees, class counsel's costs, class representative enhancement payments, and PAGA payments to the LWDA) within 10 calendar days of the effective date, if the settlement becomes final. The purchases claimed by Settlement Class and Collective Members (capped at $500, per the Settlement Agreement) amount to $6,403,734.32. (Kratz Decl. ¶ 15.) The overall average claimed purchases made by class members was $252. (*Id.*

at ¶ 13.)  The total amount allocated to each member as compensation under the Settlement Agreement will be the total of his or her claimed amount, multiplied by the Covered Item Payout Rate ("CIPR").  The CIPR is calculated by dividing the net settlement fund ($16,677,500) into the total paid by all Settlement Class and Collective members ($61,287,061).  Therefore, the CIPR equates to 27.2%.  Thus, the payment that will be made to the participating Class and Collective members totals $1,742,590.58.  (*Id*. at ¶ 15.)  Settlement payments will be distributed by the claims administrator within 20 days after funding.  Ten days after distribution, Defendants will pay administrative costs of $500,000 from the settlement fund.

> **D.      Opt-Outs (386) and Objectors (0).**

Settlement Members who wished to be excluded from the settlement were instructed to submit an Election to Opt-Out Form (enclosed in the Notice Packet) to the Claims Administrator. There were 386 persons who opted-out of the settlement.  (Kratz Decl. ¶ 10.)  The individuals who opted out will not be subject to the settlement release and will not receive any compensation from the settlement.  With only .09% (less than one tenth of one percent) of Class and Collective members opting out, this is further evidence that the clear majority of members found this settlement to be fair and reasonable.  Further, not a single objection to the settlement has been received to date, though each person received clear notice of the right and procedure to do so if they so desired.[5]  Again, this is clear evidence that the settlement members regard this Settlement – with its opportunity to make claim that any purchase was coerced – to be fair and reasonable. Courts have held that "a relatively small number of class members who object is an indication of a settlement's fairness."  *See, Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001); *see also, Robinson v. Ford Motor Co*., Nos. 1:04-CV-0084, 1:04-CV-00845, 2005 U.S. Dist. LEXIS 11673, at *17 (S.D. Ohio June 15, 2005); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 332 (W.D. Pa. 1997) ["As courts have recognized, 'in the class action context, silence by be

---

[5] A *pro se* objection was initially made and subsequently withdrawn.  The class member misunderstood the settlement and believed that she had to pay Abercrombie $25 Million.  Once this misunderstanding was cleared up, the objector withdrew her objection.  *See,* Declaration of Hallie Von Rock in Support of Final Approval ("HVR Dec." ¶ 4).

construed as assent.'" (internal citations omitted).] Here, the fact that there is not a single objection is indicative that the settlement enjoys the unanimous support of the Settlement members and is a factor which weighs in favor of final approval.

## IV. PAYMENTS REQUESTED FOR PAGA CLAIMS AND SETTLEMENT ADMINISTRATION COSTS.

### A. Private Attorney General Act Award.

Per the terms of the Settlement Agreement, the parties agreed to allocate $50,000 of the settlement fund for settlement of the Private Attorney General Act ("PAGA") claims (Cal. Labor Code §2699(i)). From this amount, 75% ($37,500) will be paid to the State of California for its share, while the remaining 25% ($12,500) is allocated to the Net Distribution Fund. The PAGA claim was brought only in the *Brown* action as it is a specific California statute. Class Counsel relied upon their experience in class action settlements to allocate $50,000 of the Settlement to PAGA penalties. *See,* HVR Dec. ¶¶ 6-7. Due to the uncertainty of recovery, class action settlements typically provide a modest allocation for PAGA claims and the amount allocated to PAGA here is within range of what courts have approved as reasonable. This amount was disclosed in the Notice and no one objected.

### B. Settlement Administration Costs.

The settlement administration costs include the costs arising from creating a website, printing, distributing, and tracking documents for the settlement, and executing the other duties set forth in the Agreement. The total settlement administration costs to be paid under the Settlement Agreement are $500,000. This amount was disclosed in the Notice. No objections were made by any Settlement Class or Collective member to these costs. The settlement administration costs are reasonable and expected given the sheer volume of Notices mailed and claims handling necessary to administer a settlement of this size. Thus, Class Counsel request that the Court authorize payment from the Settlement Fund of $500,000, to cover costs of the Settlement Administrator.

## IV. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD RECEIVE FINAL APPROVAL.

The parties respectfully request that the Court enter the accompanying proposed order

finally approving the parties' settlement.  As discussed herein, the proposed settlement is the fair, reasonable, and adequate resolution of a bona fide dispute, and the settlement classes and FLSA collective class can and should finally be certified for settlement purposes only.

> **A.  Standard for Final Approval.**

The determination to approve or reject a settlement is made in the "sound discretion of the trial court." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  Further, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015), and there is an initial presumption of fairness when, as here, a proposed class settlement is negotiated at arm's length and presented for court approval. *See*, Newberg and Conte, Newberg on Class Actions (4th ed. 2002) ("Newberg"), § 11:41, p. 90.  The function of final approval is merely "to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable[,] and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

In applying Rule 23's ""fair, reasonable, and adequate" standard,  the Sixth Circuit has established "[s]everal factors guide the inquiry: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) public interest." *UAW v. GMC*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting Fed. F. Civ. P. 23(e)(1)(A)(C)) (citing *Granada Invest., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Circ. 1992).  This settlement easily meets these factors as set forth herein.

> **1.  No Indicia of Fraud or Collusion Exist.**

The parties have aggressively litigated the *Brown* case for nearly five years, including through class certification and engaged in extensive discovery and motion practice; and the parties have litigated the *Bojorquez* action for over two years, including contested motions and

exchanging large amounts of data regarding the claims asserted.  Class counsel took and defended 39 depositions all over the country, reviewed thousands of discovery documents, and litigated complex and unique issues specific to these actions.  Further, Defendants, who were well represented by two highly-respected law firms, Greenberg Traurig, LLP, and Vorys Sater Symour & Pease, both of which have extensive employment practices and assigned top attorneys, likewise vigorously defended Abercrombie at all stages of the case.  A settlement was reached only after arm's-length negotiations during two full-day mediation sessions with well-known mediator Hunter Hughes, III, in Atlanta, another full-day in-person meeting between counsel in Los Angeles, followed by three months of telephone and email negotiations.  (Dkt. No. 168, Aiman-Smith Decl. ¶¶ 3-8.)  Thus, the evidence is clear there is not the slightest suggestion of collusion, and no objector has come forward with any case that the settlement is a product of collusion.  Furthermore, "[t]he duration and complexity of the litigation" would dispel any such suggestion.  *See, Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (citing *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)).

### 2.    The Complexity, Expense, and Likely Duration of the Litigation Favor Approval.

The dockets of these two actions demonstrate how thoroughly contested procedural, discovery, certification, damages, and merits issues were litigated.  Additionally, Plaintiffs faced the complex task of attempting to certify three separate state classes and a FLSA collective action in *Bojorquez*, and maintaining class certification status in *Brown.*  Plaintiffs assert that the certification process on the merits of *Bojorquez* would require developing consistent testimony of current and former employees located around the country to back their theory and marshal it to demonstrate violation of the nuanced, multi-element requirements of the FLSA and the labor laws of New York, Florida, and Massachusetts.  Regarding *Brown*, merits discovery would continue, and Plaintiffs would be required to oppose Defendants' contemplated motion for decertification and/or motion for summary adjudication.  Even assuming Plaintiffs were successful in each of these efforts, they would have to manage a complex trial in each case.

The expenses of ongoing litigation are significant.  The smaller *Brown* case (with 62,000

putative class members) has required 39 depositions across the country, thus far (15 more have been authorized by the Court), at significant expense in attorney time and related costs. The over-three-times-larger nationwide *Bojorquez* case could reasonably require over 100 additional depositions nationwide, a daunting further investment of attorney time and litigation costs. Indeed, even ancillary costs of prosecuting such large cases are significant. For example, in *Brown*, the cost of mailing the Class Notice was over $32,000. (Dkt. No. 168, Aiman-Smith Decl. ¶10.) The cost of a Notice in *Bojorquez* would be far greater.

Finally, the litigation—already over four years old—is likely to continue for years. Both cases are likely to take several more years of highly-contested litigation to even reach trial, without accounting for post-trial motion practice and appeals.

### 3. The Amount of Discovery Engaged in by the Parties.

The parties in *Brown* and *Bojorquez* produced and studied more than 66,000 pages of documents. (Dkt. No. 168, Aiman-Smith Decl. ¶11.) They took 39 depositions in the *Brown* case and litigated the matter through class certification and into merits discovery. In *Bojorquez*, Plaintiffs prepared a FLSA motion for conditional certification. (*Id.* ¶12.) Mediation sharpened the parties' understanding of the case. Plaintiffs' expert analyzed hundreds of thousands of rows of purchase data and payroll records for settlement class and collective members to calculate a detailed damages analysis for mediation (*Id.* ¶13), and Defendants' counsel conducted a detailed exposure analyses based on Plaintiffs' claims. (*See,* Dkt. No. 169, Kemple Decl., Ex. 4, Def. 9/13/17 Med. Brief at pp. 30-45.) The parties marshalled that data and drafted and exchanged over 196 pages of single-spaced mediation briefs (not including exhibits) and engaged in two full-day mediation sessions, as well as subsequent conference calls and meetings, where their theories and exposure were tested, revised, and refined. In sum, the parties developed a thorough understanding of the merits of their claims and defenses, allowing both sides to appreciate and consider the risks of further litigation and accurately value the case. (Dkt. No. 168, Aiman-Smith Decl. ¶16.)

### 4. The Likelihood of Success on the Merits.

"The likelihood of success, in turn, provides a gauge from which the benefits of the

settlement must be measured." *In re Gen. Tire & Rubber Co. Sec. Litig*., 726 F.2d 1075, 1086 (6th Cir. 1984). From Plaintiffs' perspective, there were risks on several fronts in the litigation. Plaintiffs are confident that they would obtain and maintain certification in both cases and believe they would prevail as to liability, based in part on the certification order in *Brown*. Defendants raised numerous arguments that could undo certification in *Brown* and defeat it in *Bojorquez*, and/or could potentially defeat liability, or at least significantly reduce damages. (*See, e.g.,* Dkt. No. 169, Kemple Decl., Ex. 4, Def. 9/13/17 Med. Brief at pp. 2-26.) For example, Defendants have noted the pitfalls of Plaintiffs' burden to establish with common proof the fact that purchases were "compelled" in light of (a) written policies stating employees are not required to purchase clothing; (b) handbooks and signed handbook acknowledgments stating employees are not required to purchase clothing; (c) signed point-of-sale acknowledgments by employees representing that the purchases made were not required by the company; (d) statements on employee cards used to make the supposed "compelled" purchases stating employees are not required to purchase clothing; (e) receipts received by each class member at purchase stating employees are not required to purchase clothing; (f) the fact that thousands of employees never made a purchase at all during their years of employment, despite the supposed "policy" requiring it; (g) direct testimony by employees stating they did not feel they were required to purchase clothing from the company; and (h) direct testimony that employees made purchases for personal, non-work reasons to take advantage of their up to 50% employee discount. (*Id*.) Thus, Defendants contend that Plaintiffs faced an uphill battle getting to trial and an insurmountable obstacle at trial. The parties' Settlement Agreement accounts for the parties' understanding of these strengths and weaknesses.

Regardless of who might prevail on these issues at trial, it is not necessary for the Court to settle questions of law and fact at this stage. A district court should neither judge the merits of the claims in dispute, nor compare the proposed settlement "against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice, supra,* 688 F.2d at 625. "Ultimately, the district court's determination [whether to finally approve a

settlement] is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Id.* (internal quotation marks omitted). *See also, In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) ("[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor [the appellate court] is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.") (citation omitted).

In assessing the settlement, "the Court should balance the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery for them, against Plaintiffs' likelihood for success on the merits." *See, In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 U.S. Dist. LEXIS 126962 *5-6 (S.D. Ohio Aug. 18, 2009) (internal citations omitted). "It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced.'" *Id.* at *6 (quoting *West Virginia v. Chas. Pfizer & Co.,* 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F. 2d 1079, 1085-86 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971)). Furthermore, where a proposed settlement provides for relief now, not perhaps some years down the road, it is proper for the parties "to take the bird in the hand instead of a prospective flock in the bush." *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 5976, 624 (D. Colo. 1974). Here, the substantial benefits provided for the Settlement Class and Collective members balanced against the uncertainties of trial weighs in favor of settlement approval.

### 5. The Opinions of Class Counsel and Class Representatives.

Class Counsel have represented employees in numerous class actions asserting violations of labor law, many resulting in published decisions. (Dkt. No. 168, Aiman-Smith Decl. ¶¶ 15-19; Ex. 2, Curr. Vitae). Class Counsel are well qualified to conduct the proposed litigation and to assess its settlement value. Based on that experience, Class Counsel believe the proposed settlement is fair and adequate to Settlement Class/Collective Members. *See, e.g.*, *Williams,* 720 F.2d at 922-923 ("It is well settled that, in approving a class action settlement, the court "should defer to the judgment of experienced counsel who has competently evaluated the strength of his

proofs."); *UAW v. Gen. Motors Corp.*, No. 05 Civ. 73991, 2006 WL 891151, *18 (E.D. Mich. Mar. 31, 2006) (holding in an FLSA case that "the endorsement of the parties' counsel is entitled to significant weight."). Here, the settlement accomplished everything it set out to do: every Settlement Class and Collective member who felt they were compelled or coerced to purchase Abercrombie clothing had the ability to make a claim and be compensated from a fund worth over $16 Million, net of fees and costs – and every timely claim will be paid. Given the strength of Plaintiffs' case, Abercrombie's defenses, and the risk, expense, complexity and duration of further litigation, the proposed settlement is not only fair, but a truly excellent result for Settlement Class and Collective members. The Representative Plaintiffs also fully support the settlement and are proud to have represented the fiduciary interests of Settlement Class and Collective members. *See*, Declarations of Representative Plaintiffs' filed in support of final approval.

### 6.      The Reaction of Absent Class Members.

Federal courts have made clear that the number or percentage of class members who object is a factor of great significance. *See, Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976); *see also, In re Am. Bank Note Holographics, Inc.*, 127 F.Supp. 2d 418, 425 (S.D.N.Y. 2001) ("[i]t is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy") (internal quotation marks and citation omitted). The absence of a negative reaction by class members strongly supports settlement.

There are no objections to the settlement, and only one tenth of one percent (0.09%) of the Settlement Class members opted out. This positive response by absent class members indicates final approval of the settlement is warranted. Moreover, the Notice advised members of all facets of the settlement and the website provided relevant documents for the actions. Having been provided all of the necessary information to evaluate the settlement, the fact that no Settlement Class or Collective member is objecting to the Agreement is a persuasive showing that the settlement is adequate. Furthermore, Class Counsel spoke with dozens of Settlement Class and Collective members during the claims administration process who thanked them for litigating the

case and voiced their approval for the settlement.  *See,* HVR Dec. ¶ 5.  Based on all of the factors listed above, including the overwhelmingly positive response, this settlement merits final approval.

### 7.  The Public Interest Favors Settlement.

The settlement "serves the public interest also by conserving the resources of the parties and the Court, and promoting the 'strong public interest in encouraging settlement of complex litigation and class action suits.'"  *UAW,* 2006 WL 891151, at *22 (quoting *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003)).  Further, though no government entity is a party, notice of settlement of the PAGA and CAFA claims was provided to all of the appropriate state and federal agencies.   No objections or concerns to the PAGA or CAFA notices have been raised by the U.S. Attorney General's Office nor any office of the Attorney General of any state.

In sum, each factor demonstrates that the settlement is fair, reasonable, and adequate.

### B.  Standard for Certification of the Settlement Classes.

"Courts have relatively regularly certified classes pursuant to Rule 23 in cases presenting hybrid class and collective allegations...."  *Filby v. Windsor Mold USA, Inc.*, No. 3:13 CV 1582, 2015 WL 1119732, at *2 (N.D. Ohio Mar. 11, 2015) (citing *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 187 (S.D. Ohio 2012); *Laichev v. JBM, Inc.*, 269 F.R.D. 633, 638 (S.D. Ohio 2008)).  Provisional certification for the purposes of settlement is different from certification for trial. Whereas the latter requires an inquiry into whether the merit of each element of the claims could be tried on a class basis, to certify a settlement-only class, "a district court need not inquire whether the case, if tried, would present intractable management problems."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); Manual for Complex Litigation, § 21.132 (4th ed. 2004).  The risk that a claim might not be certified for trial on the merits (or maintain certification) militates in favor of certification for settlement because the settlement affords relief to the class members they might otherwise not obtain at all.  Courts routinely approve class-wide settlements where the ability to obtain certification is dubious.[6]

---

[6] *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 194-95 (S.D.N.Y. 2005) ("predominance" and "manageability" concerns under Rule 23(b)(3) intertwined and approving class settlement because the "predominance defect" that barred class treatment on the merits was

To establish provisional certification, Plaintiffs must demonstrate that each element of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied. *Green v. Dressman Benzinger Lavelle, PSC*, No. 1:14-CV-00142-SJD, 2014 WL 4816698, at *2 (S.D. Ohio Sept. 18, 2014); *Swigart*, 288 F.R.D. at 182. "'[W]hen there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving the class.'" *Swigart*, 288 F.R.D. at 182 (quoting *In re Workers' Comp.*, 130 F.R.D. 99, 103 (D. Minn.1990)).

A class action is an appropriate vehicle for resolving cases in which "(1) the class is so numerous that joining of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F. 3d 838, 850 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(a)). The concepts of commonality, typicality, and adequacy "tend to merge" in practice such that they may be considered together. *Id.* at 853.

In this instance, certification is appropriate for settlement purposes because it meets the foregoing requirements and those of Rule 23(b)(3), which applies when "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that the class action is "superior to other available methods" to adjudicate the controversy fairly and efficiently." *Glazer*, 722 F.3d at 850-51.

### 1. The Settlement Classes Are Sufficiently Numerous.

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members

---

"no longer fatal"); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 557-58 (N.D. Ga. 2007) (certifying a settlement class despite serious questions as to whether the claims could be certified on their merits; "the fact of settlement is relevant to the decision to certify a class"; "Courts have, thus, certified classes at the settlement stage noting that such a certification does not present the same problems that certification of a litigation class proposing the same class definition would present"); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 292-93 (E.D. Pa. 2003) (certifying a settlement class; "manageability problem" on merits of claims was rendered moot by the settlement); *Ramirez v. DeCoster*, 203 F.R.D. 30, 36-37 (D. Me. 2001) (certifying settlement class despite having previously denied certification on the merits; settlement mooted individualized issues that had precluded certification on the merits).

is impracticable."  Fed. R. Civ. P. 23(a) (1); *Swigart,* 288 F.R.D. at 182 (finding numerosity satisfied by proposed class of 350 individuals); *see also, Cansol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("numerosity is presumed at a level of 40 members").   The California class contains 62,000 members. The proposed New York class contains approximately 38,000 members. The proposed Florida class contains approximately 39,000 members. The proposed Massachusetts class includes approximately 7,100 members.  Numerosity is satisfied.

### 2.     The Settlement Classes Resolve Common Questions.

Rule 23(a)(2) requires a showing of "questions of law or fact common to the class."  The class members' claims must depend on a "common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 27 2541, 2551 (2011).  Plaintiffs need only show that there is a "single significant question of law or fact."  *Id.*  The requirement is construed liberally, and commonality "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation."  *Swigart*, 288 F.R.D. at 183 (quoting *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)).

Here, because the parties have resolved their disputes, they will not need to prove any individualized issues relating to liability—*i.e.*, the merits of the claims themselves.  As a result, the facts that define the Settlement Class satisfy Rule 23(a)(2)'s commonality requirement.  Moreover, Plaintiffs contend the commonality requirement is readily satisfied here, given their assertions of common law and fact on these claims.[7]

### 3.     Typicality: The Claims of the Representative Plaintiffs Are Consistent With Members of the Settlement Classes.

 Rule 23(a)(3) requires that the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class."  "A proposed class representative's claim is typical

---

[7] These include whether, "despite Defendants' formal written policy of not requiring employees to purchase or wear Abercrombie clothes, managers coerce store employees to purchase Abercrombie clothing, particularly AAA clothing" and, further, whether some or all of those employees "may have suffered an additional violation of their right to earn at least minimum wage."  *Brown,* 2015 WL 9690357, at *11.

if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the] claims are based on the same legal theory." *Swigart,* 288 F.R.D. at 185 (quoting *Little Caesar Entpr. Inc. v. Smith*, 172 F.R.D. 263, 243 (E.D. Mich. 1997)). In other words, it must be true that "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

Here, each Representative Plaintiff had a similar position as a non-exempt hourly employee and has the same interest as every settlement class member: recovering unpaid minimum wages, expense reimbursements, penalties, and interest through the Settlement.

### 4. The Representative Parties Will Fairly and Adequately Protect the Interests of the Settlement Classes.

Rule 23(a)(4) requires the Court to find that the "representative parties will fairly and adequately protect the interests of the class." This turns on whether the Representative Plaintiffs and their counsel: (1) have conflicts of interest with other class members, and (2) will prosecute the action vigorously on behalf of the class. *See, Swigart*, 288 F.R.D. at 185–86 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). In other words, "Rule 23(a)(4) tests the experience and ability of counsel for plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." *Id.* (quoting *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977)).

Class Counsel are very experienced in wage and hour class actions. Attorneys at Aiman-Smith & Marcy, PC, have represented employees in numerous class actions asserting violations of labor law, including published decisions. Class Counsel are well qualified to conduct the litigation and to assess its settlement value. Based on that experience, Class Counsel agree that the proposed settlement is one that is fair and adequate to members of the Classes. *See,* HVR Dec. ¶ 8.

Here, Class Counsel represents that there are no conflicts of interest as between counsel and the Representative Plaintiffs and any member of the Settlement Classes, and that there is no evidence of antagonism between the Representative Plaintiffs' interests and those of the Settlement Classes. Representative Plaintiffs' and the Settlement Classes share a common interest in

challenging the legality of Abercrombie's policies and procedures. Moreover, there is no evidence of any collusion between the parties. Plaintiffs and their counsel have litigated this case in good faith on behalf of the entire class and will continue to do so going forward.

**5. The Predominance and Superiority Requirements of Rule 23(b) Are Satisfied by this Settlement.**

Rule 23(b)(3) poses two inquiries: (1) whether questions of law or fact common to the class members predominate over questions affecting only individual members, and (2) whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. As noted above, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." *Amchem Prods., Inc.*, 521 U.S. at 620.

Here, the parties agree for purposes of this settlement only that certification of the Settlement Classes is appropriate under Rule 23(b)(3) because: (1) the settlement obviates the litigation of individual liability and damage issues, (2) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, [(3)] and ... a class action is superior to other available methods for the fair adjudication of the controversy." *See*, Fed. R. Civ. P. 23(b)(3).

Class treatment is also the superior method for adjudicating these claims. "[F]ederal policy favor[s] settlement of class actions...." *UAW*, 497 F.3d at 632 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)). Moreover, the *Brown* court concluded that "[t]here is no evidence that individual class members have an interest in individually controlling their cases. The damages suffered by each class member are not large, class members may fear reprisal in pursuing individual claims against their employer or former employer, and individual litigation against a well-funded defendant would be cost prohibitive. ... In light of the large number of potential class members and the relatively small monetary value of their individual claims ... a class action is a superior method for resolving this case." *Brown*, 2015 WL 9690357, at *21. *See also, Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997) (that class members were not likely to

file individual actions favors class treatment).  Accordingly, this classwide settlement presents a superior method to adjudicate the case fairly and efficiently, and any difficulties in managing a class trial are obviated by this settlement.

> **C.    The Court Should Certify the FLSA Collective Class for Settlement Purposes.**

Conditional certification of a FLSA collective class for settlement purposes (here, to include only those Collective members who submitted claims through the settlement) requires a lower showing than Rule 23, and it should be granted here.  Pursuant to 29 U.S.C. § 216(b), Plaintiffs must show that all members of the collective action: (1) are "similarly situated" with respect to a company-wide unlawful policy or practice, and (2) affirmatively consent to join.  *See, Lemmon v. Harry & David Operations, Inc.*, No. 2:15-CV-779, 2016 WL 234854, at *2 (S.D. Ohio Jan. 20, 2016) (quoting *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  Regarding the first requirement, the FLSA collective members (those working in Abercrombie's stores nationwide, excluding California) are similarly situated.  Each is a non-exempt, minimum-wage or low-wage-earning employee—all of whom had same or similar job titles and responsibilities—subject to Abercrombie's national alleged practice that required the purchase of clothing as a condition of the job, a practice that allegedly violated the FLSA requirement that wages be paid "finally and unconditionally."  *See,* 29 CFR § 531.35.  As for affirmative consent, the Agreement requires collective members to have timely returned a participation form to participate.

Accordingly, this Court should certify the FLSA class to include those Collective members who timely submitted claims through the settlement, along with the Rule 23 Settlement classes, for purposes of this Settlement only.

## V.    CONCLUSION

This settlement provides a $25,000,000 common fund with Defendants making $16,667,500 in cash available to Settlement Class and Collective members, net of fees and costs.  All Settlement Class and Collective members were provided direct mail notice and had the opportunity to participate in the settlement.  The parties agreed that all 31,649 claims filed, whether

submitted through the mail or on the website, will be considered valid. There are no objections to the settlement and only 0.09% members opted-out. Accordingly, the settlement is an exceptional result that provides meaningful compensation to all Settlement Class and Collective members who felt they were compelled or coerced to purchase Abercrombie clothing.

Because the proposed settlement is fair, reasonable, and advantageous to the proposed Settlement Class and Collective members, the parties respectfully request that the Court grant this Motion and sign the accompanying proposed final approval order.

Dated: August 13, 2018                                   Respectfully submitted:


/s/  Hallie Von Rock                                      /s/  Mark D. Kemple
Hallie Von Rock                                          Mark D. Kemple
Randall Aiman-Smith                                      John Richards
Aiman-Smith & Marcy, PC                                 Greenberg Traurig, LLP
7677 Oakport Street, Suite 1150                         Century Park East, Suite 1900
Oakland, California 94621                               Los Angeles, California 90067
Telephone: 510-817-2711                                 Telephone: 310-586-7700
Facsimile: 510-562-6830                                 Facsimile: 310-586-7800
Email: hvr@asmlawyers.com                               Email: kemplem@gtlaw.com

*Attorneys for Plaintiffs and the Class*                *Attorneys for Defendants*